UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| LORENZO DAVIS, | CASE NO. 5:21-CV-00598-JRA |
| Plaintiff, | JUDGE JOHN R. ADAMS |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | REPORT AND RECOMMENDATION |
| Defendant. | |

INTRODUCTION

Plaintiff Lorenzo Davis filed a Complaint against the Commissioner of Social Security (Commissioner) seeking judicial review of the Commissioner's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On March 15, 2021, pursuant to Local Civil Rule 72.2, this matter was referred to a magistrate judge for preparation of a Report and Recommendation, and was subsequently reassigned to me pursuant to General Order 2021-06. (Non-document entry dated May 25, 2021). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

1

PROCEDURAL BACKGROUND

Mr. Davis filed his application for DIB on November 6, 2018, alleging a disability onset date of October 12, 2018. (Tr. 167, 169). His claims were denied initially and on reconsideration. (Tr. 79, 98). He then requested a hearing before an Administrative Law Judge. (Tr. 116). Mr. Davis (represented by counsel), and a vocational expert (VE) testified at a hearing before the ALJ on June 30, 2020. (Tr. 32-64).

On July 14, 2020, the ALJ issued a written decision finding Mr. Davis not disabled. (Tr. 12-24). The Appeals Council denied Mr. Davis's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see* 20 C.F.R. §§ 404.955, 404.981). Mr. Davis timely filed this action on March 15, 2021. (ECF #1).

FACTUAL BACKGROUND

I.      PERSONAL AND VOCATIONAL EVIDENCE

Mr. Davis was 38 years old on alleged onset date, and 40 years old at the time of the administrative hearing. (Tr. 65). Mr. Davis did not graduate from high school but received a diploma several years ago after taking online classes. (Tr. 39). In the past, Mr. Davis has worked in fast food restaurants, at Sears, and as a road construction or traffic control flagger. (Tr. 39-40).

II.     RELEVANT MEDICAL EVIDENCE

**Physical Impairments.** On June 4, 2018, while playing basketball, Mr. Davis heard a pop in his right ankle. (Tr. 299). Physical examination at the emergency department revealed a positive Thompson's test, indicating a possible tendon rupture. (Tr. 300). After imaging of the ankle revealed no acute abnormalities, Mr. Davis was referred to an orthopedic specialist and discharged with crutches, a splint, and short-term prescriptions for Norco and naproxen. (Tr. 302, 307).

2

On June 14, 2018, Mr. Davis underwent a right Achilles tendon repair. (Tr. 329). Mr. Davis attended follow-up sessions with his surgeon, George Papacostas, M.D., at Omni Orthopaedics. (Tr. 358-60). On August 7, 2018, Mr. Davis wore a regular shoe and had an antalgic gait. (Tr. 395). On September 4, 2018, Mr. Davis reported ankle pain with activity and associated swelling. (Tr. 367). He also reported not attending physical therapy. (*Id.*). The surgeon noted Mr. Davis walked with a non-antalgic gait, and had some diminished right ankle strength, mild swelling, and tenderness. (Tr. 368).

On October 12, 2018, Mr. Davis went to the emergency department complaining of low back pain. (Tr. 409). Physical examination revealed reproducible bilateral paralumbar tenderness and muscle spasm but was otherwise normal. (*Id.*).

On October 25, 2018, Mr. Davis saw Ryan Gasser, M.D., at Omni Orthopaedics. (Tr. 384). Mr. Davis complained of low back pain, described as sharp and squeezing, with radiating pain down the right leg. (*Id.*). He reported the symptoms were aggravated by bending, standing, and walking, and alleviated by leaning over and squatting down. (*Id.*). On examination, Mr. Davis walked with a normal gait, had normal posture, and stood upright without difficulty. (Tr. 385). He did not have tenderness or instability, had full motor strength and range of motion in the spine and lower extremities, and displayed normal coordination. (*Id.*).

On November 5, 2018, Mr. Davis returned to Dr. Gasser and reported right hip pain and low back pain extending into the right buttock and thigh that was aggravated by activity, lying down, and movement. (Tr. 374-75). On examination, Mr. Davis walked with a normal gait, had normal posture, and stood upright without difficulty. (Tr. 375). He did not have tenderness or instability, had full motor strength and range of motion in the spine and lower extremities, and

displayed normal coordination. (*Id.*). Pelvic X-rays revealed mild narrowing of the right hip joint with mild sclerosis but was otherwise normal. (*Id.*).

At the request of Dr. Gasser, Kelsey O'Connor, D.O., examined Mr. Davis on November 8, 2018. (Tr. 387). Dr. O'Connor observed diminished sensation to light touch at the right posterior calf, a non-antalgic gait, limited spinal range of motion with pain at the extremities, and tenderness to palpation of the axial lumbar spine and paraspinal musculature. (Tr. 388).

On November 19, 2018, Mr. Davis received a lumbar epidural steroid injection at L5-S1. (Tr. 377). He returned to Omni Orthopaedics for a follow-up appointment on December 5, 2018, and reported low back, right buttock, and right thigh pain with leg weakness. (*Id.*). Mr. Davis also reported the steroid injection provided fifty percent pain relief for two days before his pain returned. (*Id.*). On examination, he displayed an antalgic gait, limited spinal range of motion with pain, and full motor strength. (Tr. 378). Lumbar spinal facet load testing was positive on the left and right. (*Id.*). A lumbar MRI showed subtle left lumbar scoliosis with increased lumbar lordosis, well-hydrated disc spaces without cord or nerve root compression, and without foraminal or central canal stenosis at T11-L4. (Tr. 379). There was mild disc desiccation at L4-L5, where a disc displacement was also found to indent the thecal sac and mildly narrow the inferior neural foramen without nerve root compression. (*Id.*). L5-S1 also showed mild disc desiccation and a shallow broad-based protrusion with annular rent and mild facet arthropathy that indents the thecal sac and mildly narrows the neural foramen, with abutment of the exiting L5 and descending S1 nerve roots. (*Id.*). He underwent two repeat lumbar epidural steroid injections in December 2018 without relief. (*Id.*; Tr. 416-17, 448).

4

Mr. Davis continued to report back pain in January 2019. (Tr. 425). During a visit to the emergency department, Mr. Davis demonstrated a limping gait favoring his right leg. (Tr. 427). At his appointment with Dr. O'Connor on January 15, 2019, Mr. Davis reported continued low back pain radiating to the lateral aspect of the right leg, and numbness over the right arm and leg. (Tr. 448). He endorsed difficulty with prolonged standing, bending, twisting, stooping, climbing stairs, and doing housework. (Id.). On examination, Mr. Davis walked with a non-antalgic gait and had limited spinal range of motion with pain. (Tr. 449). Dr. O'Connor prescribed gabapentin 600 mg and tizanidine 4 mg. (Tr. 450).

On January 21, 2019, Mr. Davis saw Michael Stonestreet, M.D., for right hip pain. (Tr. 452). Dr. Stonestreet noted Mr. Davis walked with a stooped gait but tolerated near full range of motion testing on the right hip with minimal exacerbation of pain. (Tr. 453). After reviewing X-rays demonstrating very little osteoarthritis in the right hip, Dr. Stonestreet felt Mr. Davis's symptoms were referred from his back secondary to his posture when ambulating and discussed physical therapy for core strengthening and ambulation. (Tr. 453-54).

On January 25, 2019, Mr. Davis met with Douglas Ehrler, M.D., an orthopedic surgeon. (Tr. 455). Mr. Davis arrived in a wheelchair, but physical examination was normal. (Tr. 458). Dr. Ehrler reviewed the lumbar MRI and assessed Mr. Davis with L5-S1 foraminal lumbar stenosis, a mid-line disc bulge at L4-L5, lumbar radiculopathy, and greater trochanteric bursitis of the right hip. (Tr. 457). He advised Mr. Davis that there is no surgery to address his conditions. (Id.).

On April 19, 2019, Mr. Davis received a prescription for a hand cane with direction to "use daily as needed." (Tr. 650). Mr. Davis began attending physical/aquatic therapy sessions in April 2019. (Tr. 626). Therapy services were discontinued on July 1, 2019. (Tr. 606).

An October 2019 scan revealed an endplate spur formation at T8-T9. (Tr. 576).

**Mental Impairments.** In February 2019, Mr. Davis began treating with Mark Snavely, M.D., to address symptoms of depression. (Tr. 478). He reported chronic back pain as his main stressor. (Tr. 478). Dr. Snavely noted Mr. Davis rested comfortably in a wheelchair but was anxious and tearful. (*Id.*). Dr. Snavely diagnosed Mr. Davis with chronic depression, pain disorder, possible PTSD, and alcohol abuse. (Tr. 479). He prescribed trazadone and Zoloft. (*Id.*).

In March 2019, Mr. Davis reported depression, anxiety, poor sleep, fatigue, feeling overwhelmed, and unrelenting physical pain. (Tr. 476). Dr. Snavely noted Mr. Davis was anxious and irritable. (*Id.*). Dr. Snavely encouraged Mr. Davis to stop taking trazadone and Zoloft and begin taking Remeron. (*Id.*). In April 2019, Mr. Davis met with Dr. Snavely and expressed feeling hopeless that any doctor will be able to help him with his pain. (Tr. 475). Mr. Davis was tearful and anxious. (*Id.*). Dr. Snavely offered a prescription of Cymbalta to augment Remeron. (*Id.*).

In May 2019, Mr. Davis reported ongoing depression, poor sleep, feeling overwhelmed, and irritability. (Tr. 497). He was anxious and tearful, and endorsed significant back pain. (*Id.*). Dr. Snavely increased the dosage of Cymbalta and added Zyprexa. (*Id.*). In July 2019, Mr. Davis reported modest improvement, with lower levels of depression and anxiety, but continued significant back pain. (Tr. 496). Mr. Davis indicated feeling his current medications, including Remeron, Cymbalta, and Zyprexa, were quite helpful. (*Id.*).

## III. MEDICAL OPINIONS

**State Agency Review**. Linda Hall, M.D., reviewed Mr. Davis's medical records and concluded he was not disabled. (Tr. 79-80). Dr. Hall opined Mr. Davis could occasionally lift and carry twenty pounds, ten pounds frequently; stand and/or walk about six hours in an eight-hour

workday; sit for about six hours in an eight-hour workday; occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl. (Tr. 75). At the reconsideration level, Maureen Gallagher, D.O., reviewed Mr. Davis's medical records and concurred with Dr. Hall's opinion. (Tr. 93-94).

On initial consideration, Cynthia Waggoner, Psy.D., determined Mr. Davis was moderately limited in his abilities to understand, remember, and apply information, interact with others, and concentrate, persist, and maintain pace, but was not limited in his ability to adapt or manage himself. (Tr. 72). Dr. Waggoner concluded Mr. Davis can understand and follow simple, routine, one- and two-step directions; can perform simple, routine, low stress, one- and two-step tasks without rapid pace demands; can relate with coworkers and supervisors on an occasional and superficial basis; and should avoid tasks requiring public interaction. (Tr. 77). On reconsideration, Deryck Richardson, Ph.D., adopted Dr. Waggoner's opined limitations, but determined Mr. Davis is also moderately limited in his ability to adapt and self-manage and further restricted Mr. Davis to positions where major changes are infrequent and introduced in advance. (Tr. 91, 95-97).

**Bryan Krabbe, Psy.D.** On March 1, 2019, Mr. Davis underwent a consultative psychological evaluation. (Tr. 465). Dr. Krabbe performed a clinical interview and reviewed unspecified background materials provided by the Ohio Division of Disability Determinations. (*Id.*). During the interview, Mr. Davis reported hip bursitis, disc bulge, and spinal stenosis, which affect his abilities to walk, stand, bend, and lift objects. (Tr. 467). He endorsed symptoms of depression and PTSD. (Tr. 468).

Dr. Krabbe noted Mr. Davis was nervous and trembled when discussing past and current pressures, had limited attention and concentration skills, and had difficulty understanding and

7

responding to direct questions, requiring information to be simplified. (Tr. 470, 472). Based on testing, Mr. Davis was estimated to be in the borderline range of intellectual functioning. (Tr. 470). Dr. Krabbe indicated Mr. Davis would have some limitation in his abilities to understand, remember, and carry out instruction; concentrate, persist, and maintain pace; relate to others; and adapt to the stresses of day-to-day work. (Tr. 472).

IV.    ADMINISTRATIVE HEARING

The following summarizes the testimony of Mr. Davis and VE Kathleen Reis presented during the hearing before the ALJ.

Mr. Davis did not graduate from high school but enrolled in online classes several years ago and, with his wife's help, earned a diploma. (Tr. 39). He was enrolled in special education classes. (Tr. 49). He continues to have difficulty with reading comprehension and often needs additional explanation. (Tr. 48). His wife helps him when necessary. (Tr. 49).

In 2018, Mr. Davis ruptured his Achilles tendon, for which surgical repair and time off work was necessary; he returned to work after recovery from the surgery. (Tr. 47). Mr. Davis last worked at Sears in 2018. (Tr. 40-41). He was terminated because he was unable to continue lifting the five- and ten-pound boxes due to his back pain. (Tr. 41, 48). Mr. Davis remains unable to work because he has difficulty walking more than five or ten minutes. (Tr. 41). Doing so causes back, hip, and leg pain. (Tr. 42).

Mr. Davis received injections in his lower back, but they did not help. (*Id.*). Mr. Davis continues to take medication for his back but has not received other treatment because his doctors tell him there is nothing else to do for it. (*Id.*). According to his doctor, he cannot receive additional injections. (Tr. 43). When Mr. Davis takes pressure off his right side, *i.e.,* by sleeping on

his left side or leaning to the left, the back pain goes away. (Tr. 45). Walking causes the pain to return. (*Id.*). Mr. Davis must reposition himself when sitting to relieve the pain. (*Id.*). He believes he can sit for five to ten minutes before needing to reposition or stand up. (Tr. 54).

Mr. Davis also has right hip pain, which is aggravated by movement and alleviated by rest. (*Id.*). He has received some steroid injections into the hip, but they were not effective. (Tr. 46).

Mr. Davis was prescribed a hand cane, which he holds in his right hand whenever he stands up and walks, even when at home. (Tr. 44, 54). He uses the cane for both standing and ambulation. (Tr. 54).

In addition to pain medication, Mr. Davis takes medication for symptoms of anxiety and depression. (Tr. 42-43). Dr. Snavely calls in prescriptions for Mr. Davis. (Tr. 46-47). Mr. Davis feels the medications help calm him down and relieve him of suicidal thoughts. (Tr. 47). Despite this, he still feels depressed all the time, keeping him from doing anything. (*Id.*).

On a typical day, Mr. Davis watches television on the couch and lets his dogs outside. (Tr. 51). Mr. Davis can make simple meals, but his wife does most of the cooking because he finds it difficult to stand for prolonged periods. (Tr. 52). Due to limited mobility, Mr. Davis no longer does household chores. (*Id.*). At the time of the hearing, Mr. Davis had not been in his basement for a year and a half because he finds it difficult to navigate stairs. (Tr. 53). Mr. Davis's wife does the grocery shopping, but sometimes Mr. Davis will accompany her. (*Id.*). Mr. Davis used to walk three miles to a store up the road but can no longer do so. (*Id.*). Mr. Davis sometimes travels with his wife to see his sister, nieces, and nephews. (*Id.*).

The VE then testified. The ALJ asked if a hypothetical individual of Mr. Davis's age and education could perform any work if restricted to light work and additionally limited to

9

occasionally climbing ramps and stairs; never climbing ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; simple, routine, and repetitive tasks, but not at a production-rate pace; simple work-related decisions; occasional interaction with supervisors, coworkers, and the public; and few changes in a routine work setting. (Tr. 58-59). The VE identified three light, unskilled SVP positions such an individual could perform: merchandise marker (DOT 209.587-034; at least 282,00 jobs in the national economy); housekeeping cleaner (DOT 323.687-014; at least 200,000 jobs in the national economy); and document specialist (DOT 207.685-014; at least 60,000 jobs in the national economy). (Tr. 59).

If the same hypothetical individual required a cane for ambulation, then the individual would be precluded from light work. (Tr. 59-60). The VE identified sedentary, unskilled positions such an individual could perform, including document preparer (DOT 249.587-018; at least 47,600 jobs in the national economy); touchup screener (DOT 726.684-110; at least 32,700 jobs in the national economy); and ticket counter (DOT 219.587-110; at least 32,000 jobs in the national economy). (Tr. 60). If the individual required the use of a cane for ambulation and standing, then the person would be precluded from all work. (*Id.*).

The VE concluded by testifying that an employer tolerates an off-task rate of up to 15% and one or fewer absences per month. (Tr. 61).

### THE ALJ's DECISION

The ALJ found Mr. Davis not disabled. (Tr. 24). The ALJ's written decision, dated July 9, 2020, included the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act (the "Act") through December 31, 2023.

2.      The claimant has not engaged in substantial gainful activity since October 12, 2018, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.      The claimant has the following severe impairments: obesity, sleep apnea, degenerative disc disease of the lumbar spine, osteoarthritis/status-post repair of right Achilles tendon (20 CFR 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.      After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that the claimant may occasionally balance, stoop, kneel, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes, or scaffolds; the claimant is limited to the performance of simple, routine, repetitive tasks and the making of no more than simple, work-related decisions, conducted in a setting free of production-rate pace [as is found in assembly line work], which setting requires no more than occasional interaction with co-workers, supervisors and the public, which setting is routine, in that it contemplates few changes in workplace tasks and duties.

6.      The claimant has no past relevant work (20 CFR 404.1565).

7.      The claimant was born on January 30, 1980 and was 38 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.      The claimant has at least a high school education (20 CFR 404.1564).

9.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from October 12, 2018, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 12-24) (brackets in original).

11

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of

evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

13

5.      Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Mr. Davis claims the appointment of Andrew Saul as the Commissioner of the Social Security Administration violated the separation of powers and, as such, a written decision from an ALJ who derives his authority from Mr. Saul is constitutionally defective, entitling Mr. Davis to remand for a *de novo* hearing. (Pl's Br., ECF #14, PageID 754, 756). Additionally, Mr. Davis argues the ALJ erred at Step Three, did not properly consider the effect of Mr. Davis' severe impairments in combination when assessing his residual functional capacity, and did not properly evaluate his symptoms in accordance with Social Security Ruling (SSR) 16-3p. (*Id.* at PageID 756, 768).

The Commissioner concedes the language in 42 U.S.C. § 902(a)(3) restricting the President's ability to remove the Commissioner only for "neglect of duty or malfeasance of office" violates the separation of powers because it limits the President's authority to remove the Commissioner without cause. (Comm'r's Br., ECF #18, PageID 811). However, the Commissioner

14

argues Mr. Davis has not shown the kind of harm necessary to entitle him to remand. (Comm'r's Br., ECF #18, PageID 811). As to Mr. Davis's disability-related arguments, the Commissioner asserts the ALJ appropriately analyzed the objective medical evidence in light of the relevant Listing of Impairments at Step Three (*Id.* at PageID 824), properly considered and weighed the relevant evidence to conclude Mr. Davis retained the residual functional capacity to perform a range of light work (*Id.* at PageID 830), and properly evaluated Mr. Davis's symptoms. (*Id.* at PageID 831).

As explained below, I agree with the Commissioner and conclude that, as to § 902(a)'s removal provision, Mr. Davis has not shown the harm necessary to entitle him to remand for a *de novo* hearing. Moreover, after review of the record and according all due deference to the ALJ's conclusions, I find that substantial evidence supports the finding of non-disability and am not persuaded by Mr. Davis's argument that this finding rests on an improper analysis of the record. I therefore recommend the District Court affirm the Commissioner's decision.

## I.      The Constitutional Challenge

Initially, I conclude Mr. Davis has not forfeited his ability to raise his constitutional challenge even though he did not advance this argument at the administrative level. (*See* Pl.'s Br., ECF #14, PageID 756). In *Carr v. Saul*, 141 S. Ct. 1352 (2021), the Supreme Court held a claimant does not need to exhaust a constitutional claim at the administrative level, but instead may present such a claim for the first time at the district court level. *Id.* at 1362. But Mr. Davis is still not entitled to an order of remand from this Court.

In *Seila Law LLC v. Consumer Financial Protection Bureau,* 140 S. Ct. 2183, 2197 (2020), the Supreme Court found that a statutory restriction on the President's ability to remove the head of an agency "only for inefficiency, neglect, or malfeasance" violates the separation of powers and is

unconstitutional. The Court further found the offending clause was severable from the other portions of its Act, thereby maintaining CFPB intact as an agency. *Id.* at 2208, 2211.

Subsequently, in *Collins v. Yellen*, the Court considered the Federal Housing Finance Agency (FHFA) and its enabling statute, which contained a provision stating that the head of FHFA was removable by the President "only 'for cause.'" 141 S.Ct. 1716, 1770 (2021). The Court concluded such a provision violated the separation of powers and was unconstitutional. *Id.* Relying on *Seila Law,* the Court further explained the unconstitutionality of a removal provision does not strip an agency head of the authority to carry out the other functions of the office. *Collins*, 141 S.Ct. at 1788; *see also id.* at n.23 ("Settled precedent also confirms that the unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office . . . .") (citing *Seila Law*, 140 S.Ct. at 2207-11). Instead, to obtain remand, the plaintiff must demonstrate "compensable harm" flowing from the unconstitutional removal clause. *See id.* at 1788-89. The absence of a nexus between the purported harm and the challenged removal restriction "defeats the . . . argument for setting aside" agency action. *See id.* at 1787.

Mr. Davis claims he did not receive a valid administrative process because the ALJ's authority to make disability determinations was derived from a Commissioner who was subject to an unconstitutional removal provision. (Pl.'s Br., ECF #14, PageID 755). In addition, Mr. Davis claims, "Mr. Saul implemented changes to HALLEX and new regulations which impacted [him] and his application for benefits," and therefore, he was harmed by "the modifications which were implemented during [Mr.] Saul's tenure as Commissioner." (*Id.* at PageID 756).

As in *Collins,* the existence of an unconstitutional removal provision did not strip Commissioner Saul of his authority to carry out the functions of his office, including the authority

to delegate disability determinations to ALJs and to implement changes to Agency regulations. Without Mr. Davis showing that § 902(a)(3)'s removal restriction inflicted specific, compensable harm on him, remand for a *de novo* hearing is not available to him.

Moreover, Mr. Davis does not address the fact that the specific ALJ who presided over his case—Judge Beatty—was not appointed by a Commissioner subject to § 902(a)(3)'s removal restriction, but rather was ratified by an Acting Commissioner who was not tenure-protected. (*See* Comm'r's Br., ECF #18, PageID 813). Because Acting Commissioner Berryhill served pursuant to provisions of the Federal Vacancies Reform Act, 5 U.S.C. §§ 3345-3349c, her appointment was not subject to the same constitutional deficiencies as Commissioner Saul. *See* 5 U.S.C. § 3346(a)(1). Acting Commissioner Berryhill had no statutory tenure protections. *See* 42 U.S.C. § 902(b)(4); *see also Collins*, 141 S. Ct. at 1782-83 (noting that FHFA's Acting Director was removable at-will because the relevant subsection "does not include any removal restriction. Nor does it cross-reference the earlier restriction on the removal of a confirmed Director."); *United States v. Eaton*, 169 U.S. 331, 343 (1898) ("Because the subordinate officer is charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions, he is not thereby transformed into the superior and permanent official. To so hold would render void any and every delegation of power to an inferior to perform under any circumstances or exigency the duties of a superior officer, and the discharge of administrative duties would be seriously hindered.").

Because Acting Commissioner Berryhill was not the "superior and permanent official" as a confirmed director, she was removable at-will; thus, there is no nexus between Acting Commissioner Berryhill's ratification of Judge Beatty's appointment and the unconstitutional

17

provisions of § 902(a)(3). As a result, I conclude Mr. Davis has not shown that Acting Director Berryhill or Judge Beatty lacked authority to carry out the functions of their respective offices due to the constitutional defect in § 902(a)(3). *See Collins*, 141 S. Ct. at 1788 n.23 (noting that "unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office . . . ").

Other federal courts in this judicial district, this state, and across the country, have concluded that the allegedly unconstitutional appointment of Andrew Saul does not require remand. *See, e.g., Katrina R. v. Comm'r of Soc. Sec.*, No. 2:21-CV-4276, 2022 WL 190055, at *5 (S.D. Ohio Jan. 21, 2022) (collecting cases); *Miley v. Comm'r of Soc. Sec.*, No. 1:20-CV-2550, 2021 WL 6064754, at *9 (N.D. Ohio Dec. 22, 2021). I similarly decline to recommend remand on this basis.

Because Mr. Davis has not articulated a specific, compensable harm he sustained as a result of the unconstitutional removal provision in § 902(a)(3), his constitutional challenge fails.[1]

---

[1]    Given this determination, it is unnecessary for me to address the Commissioner's alternative arguments opposing Mr. Davis's constitutional challenge (harmless error doctrine, de facto officer doctrine, rule of necessity, and broad prudential considerations). (Comm'r's Br., ECF # 18, PageID 819-22). *See, e.g., Cary v. Mox*, No. 17-cv-12862, 2018 WL 4402939, at *10 n.6 (E.D. Mich. Aug. 14, 2018) ("Because Defendants Washington and Leach are entitled to summary judgment on the basis of exhaustion, and in the interest of judicial economy, the Court does not reach their alternative arguments for dismissal or summary judgment."), *report and recommendation adopted*, 2018 WL 4385793 (E.D. Mich. Sep. 14, 2018); *see also Butcher v. Comm'r of Soc. Sec*, No. 2:20-CV-6081, 2021 WL 6033683, at *8 (S.D. Ohio Dec. 21, 2021) ("Plaintiff's separation of powers claim lacks merit. Accordingly, the Undersigned does not reach the Commissioner's alternative arguments including harmless error, de facto officer, the rule of necessity, and other prudential considerations."), *report and recommendation adopted*, 2022 WL 523519 (S.D. Ohio Feb. 22, 2022).

## II.  At Step Three, the ALJ reasonably concluded Mr. Davis' impairments do not meet a Listing.

The Step Three analysis centers on the medical severity of a claimant's impairment and whether a claimant meets a listed impairment. 20 C.F.R. § 404.1520(a)(4)(iii). The listings include over a hundred conditions SSA considers "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a); *Sheeks v. Comm'r of Soc. Sec. Admin.*, 544 F. App'x 639, 641 (6th Cir. 2013). The listings work to "streamline the decision process," shifting the focus onto the claimant's impairment and away from the ability to work. *Sheeks*, 544 F. App'x at 641 (quoting *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987)).

If a claimant's impairment meets the description of a Listing or its equivalent, the claimant will be found disabled. *Bowen*, 482 U.S. at 141 (1987); *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). "[F]or a claimant to show that his impairment matches a listing it must meet all of the specified medical criteria," *Zebley*, 493 U.S. at 530, and it is not enough that a claimant comes close to meeting or almost meets the requirements of a Listing. *Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1986). The claimant bears the burden of establishing every element of the specified criteria. *Bowen*, 482 U.S. at 146 n.5; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).

When evaluating whether a claimant's impairment meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant Listing], and give an explained conclusion, in order to facilitate meaningful review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011). To obtain remand, a claimant must do more than question the ALJ's decision; the claimant "must show that the open question is a *substantial* one that justifies a remand." *Id.* (emphasis in original).

19

Here, the ALJ analyzed Listings 1.02, 1.03, and 1.04, all of which relate to musculoskeletal impairments. (Tr. 15-16; 20 C.F.R. Pt. 404, Subpt. P, App. 1.). The ALJ determined Mr. Davis did not meet Listing 1.02 because clinical examinations describe a normal gait and ability to ambulate, "albeit sometimes with difficulty," and the record does not indicate Mr. Davis is unable to ambulate effectively, as required by the Listing.[2] (Tr. 15). The ALJ concluded Mr. Davis did not meet Listing 1.03 for the same reason. (*Id.*). Finally, the ALJ determined Mr. Davis did not meet Listing 1.04 because the medical records did not show evidence of nerve root compression, spinal arachnoiditis, or an inability to ambulate effectively. (Tr. 16).

Because the ALJ evaluated the evidence, compared the evidence to the relevant Listings, and gave an explained conclusion, the ALJ did not err at Step Three. Moreover, the ALJ's conclusions as to Listings 1.02, 1.03, and 1.04 are supported by substantial evidence, including evidence demonstrating that Mr. Davis had a normal gait and could ambulate effectively. (Tr. 375, 449, 584).

Mr. Davis argues he met a Listing because he needed a cane for standing and ambulation and his MRI revealed nerve root compression at L5-S1. (Pl.'s Br., ECF #14, PageID 759). While the ALJ acknowledged Mr. Davis had a prescription for a cane, the ALJ reasonably concluded the objective medical evidence established Mr. Davis could ambulate effectively, citing records showing normal gait and the ability to ambulate. (Tr. 15, 23) (citing Tr. 375, 449, 584, 646). Moreover, even if the evidence did show that Mr. Davis required a cane to walk, this still does not meet the definition of "ineffective ambulation." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.00B2b2

---

[2]      Ineffective ambulation is defined generally as having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

(Examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker or two crutches or two canes.). Despite Mr. Davis's assertion otherwise, the MRI showed "abutment" of a nerve root (Tr. 389), evidence of which is – as the Commissioner correctly points out – "insufficient to satisfy Listing 1.04(a)'s requirement of nerve root compression." *Dunkel v. Comm'r of Soc. Sec.*, No. 19-10267, 2020 WL 1502006, at *3 (E.D. Mich. Mar. 30, 2020) (citation omitted); *see also Starkey v. Comm'r of Soc. Sec.*, No. 19-10267, 2020 WL 1502006, at *9 (S.D. Ohio Dec. 20, 2021) (holding that plaintiff did not meet Listing 1.04 where he pointed to evidence of abutment of a nerve root in his lower back, but "conspicuously fail[ed] to point to any evidence of nerve root compression").

While the ALJ did not find Mr. Davis's mental impairments to be severe (Tr. 14), he considered Listing 12.04 for depressive disorders, Listing 12.08 for personality or impulse-control disorders, Listing 12.11 for neurodevelopment disorders, and Listing 12.15 for trauma or stressor-related disorders. (Tr. 15). To meet any of those Listings, a claimant must have an extreme limitation of one, or marked limitation of two, of the following:

1. Understanding, remembering, or applying information;

2. Interacting with others;

3. Concentrating, persisting, or maintaining pace;

4. Adapting or managing oneself.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.04(B), 12.08(B), 12.11(B), 12.15(B).

Analyzing those Paragraph B criteria, the ALJ found Mr. Davis was moderately limited in all areas. (Tr. 16-17). The ALJ supported each of his findings with citations from the record, including treatment notes that routinely assess Mr. Davis's fund of knowledge as adequate and

show an intact mood and memory, evidence that Mr. Davis falls within the borderline range of intellectual functioning but acquired his GED at age thirty-five, and evidence that Mr. Davis can function in public settings, attend to personal care, help with the care of pets, prepare simple meals, and manage his own appointments. (*Id.*).

Mr. Davis notes the ALJ erroneously stated he could drive a car and argues that, because of this error, the evidence did not support the ALJ's conclusions regarding the Paragraph B criteria. (Pl.'s Br., ECF #14, PageID 761). The fact Mr. Davis does not drive a car (*see* Tr. 54) does not, however, detract from the substantial evidence that otherwise supports the ALJ's conclusions.

Mr. Davis asserts the ALJ failed to properly evaluate his obesity. (Pl.'s Br., ECF #14, PageID 829). But, as the Commissioner points out, Mr. Davis does not show how his obesity limited him to a degree inconsistent with the RFC. *See Foss v. Comm'r of Soc. Sec.*, No. 1:16 CV 1907, 2017 WL 2912524, at *8 (N.D. Ohio June 20, 2017), *report and recommendation adopted*, 2017 WL 2908857 (N.D. Ohio July 7, 2017) ("Foss had the burden of showing specifically how [her] obesity, in combination with other impairments, limited [her] ability to a degree inconsistent with the ALJ's RFC determination.") (cleaned up). I decline to decide issues that Mr. Davis has not adequately raised. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (noting that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

I find no error in the ALJ's Step Three determinations.

## III. The ALJ properly considered the relevant evidence when assessing the RFC.

The RFC is what an individual can still do despite his limitations. SSR 96-8p. It is an administrative assessment of the extent to which an individual's impairments and related

symptoms may cause limitations or restrictions that affect his capacity to do work-related activities. *Id.* An ALJ's RFC assessment must be based on all relevant evidence in the case record and must include "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.*

Where a claimant alleges symptoms, such as pain, the RFC assessment must also "contain a through discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate." SSR 96-8p. "In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer,* 744 F. Supp. 2d at 881.

Here, the ALJ thoroughly reviewed the objective medical evidence, including diagnostic imaging showing very little arthritis of the right hip without deformity or lesions, disc desiccation at L4-L5 and L5-S1 without significant stenosis and without nerve compression, and clinical examinations showing spinal tenderness, but normal sensory function and normal extremity movement. (Tr. 18). The ALJ weighed this objective medical evidence against the other evidence of record, including Mr. Davis's statements about his functional limitations, and reasonably concluded that the consistently benign or mildly adverse findings support the determination that Mr. Davis can perform a range of light work. For instance, while Mr. Davis asserts pain that is disabling, the ALJ noted Mr. Davis had not sought treatment for his back pain since completing physical therapy more than one year ago and consistently exhibited normal strength and

neurological function. (Tr. 18-19). The ALJ acknowledged Mr. Davis's receipt of a prescription for a cane but determined the cane was not "medically necessary because of the normal, and unassisted gait observations included in the record, both before and since its issuance." (Tr. 23) (citing Tr. 375 (November 2018 treatment note showing normal gait and station), 449 (January 2019 treatment note showing non-antalgic gait, favoring neither extremity), 584 (a fall risk assessment contained within an October 2019 emergency room note indicating Mr. Davis did not have an impaired gait and did not use an assistive device)).

Mr. Davis claims that because he sometimes had an antalgic gait and began using a wheelchair in January 2019, the ALJ should have included a limitation in the RFC reflecting Mr. Davis's need for a cane. (Pl.'s Br., ECF #14, PageID 766-67). But this argument is tantamount to a request for the court to reweigh the evidence in a light more favorable to him, which it cannot do. *See Brainard*, 889 F.2d at 681 (6th Cir. 1989) (on substantial evidence review, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence). Moreover, it bears repeating that even if substantial evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477 (6th Cir. 2003).

Mr. Davis next claims that when crafting the RFC, the ALJ focused on benign or mildly adverse findings and disregarded evidence that did not support his foregone conclusions, specifically the November 2018 lumbar MRI. (Pl.'s Br., ECF #14, PageID 765-66). Contrary to this assertion, the ALJ did consider the results of the MRI but determined that the mild findings, both within the MRI and throughout the record, supported no more restrictions than set out in the ALJ's RFC.

24

Based on the foregoing, I find no error in the ALJ's assessment of Mr. Davis's RFC, which is supported by substantial evidence.

**IV.     The ALJ properly evaluated Mr. Davis's symptoms in accordance with SSR 16-3p.**

An ALJ follows a two-step process for evaluating an individual's symptoms. In Step One, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. In Step Two, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second stage, the ALJ considers all relevant evidence, including

(1)     a claimant's daily activities;

(2)     the location, duration, frequency, and intensity of pain or other symptoms;

(3)     factors that precipitate and aggravate the symptoms;

(4)     the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

(5)     treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;

(6)     any measures other than treatment an individual uses or used to relieve pain or other symptoms; and

(7)     any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms.

*Id.*

The ALJ is not required to analyze all seven factors, but only those factors germane to the alleged symptoms. *See, e.g., Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005)

("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence.").

The ALJ is not required to accept the claimant's subjective complaints, and may discount the claimant's subjective testimony when the ALJ deems it inconsistent with objective medical and other evidence. *Jones*, 336 F.3d at 475-76. The ALJ's decision must include "specific reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p. The ALJ need not use any "magic words," so long as it is clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021).

An ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). This Court must accord great weight and deference to the ALJ's opinion of subjective evidence, due to the ALJ's opportunity to observe a claimant's demeanor during the hearing—an opportunity this Court is not afforded in its review. *Jones*, 336 F.3d at 476. Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints, or the conclusions drawn from it. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]" *See Ulman*, 693 F.3d at 713-14.

Here, the ALJ considered Mr. Davis's statements about the intensity, persistence, and functionally limiting effects of his symptoms, but concluded that his statements were not entirely consistent with the medical and other evidence in the record. In addition to finding that the

mildly adverse and benign findings were not consistent with the alleged severity of pain, the ALJ considered Mr. Davis's reported daily activities, including attending to person care, performing typical household chores, helping care for pets, preparing simple meals, watching television, and managing his own appointments, and determined that the ability to perform such activities was inconsistent with Mr. Davis's complaints of disabling symptoms. (Tr. 20-21). Finally, when evaluating the intensity, persistence, and limiting effects of Mr. Davis's symptoms, the ALJ considered Mr. Davis's current medications, largely prescribed in relation to his mental health impairments with the exception of medication for hypertension, and Mr. Davis's failure to engage in further treatment for back pain after concluding physical therapy. (Tr. 19) (citing Tr. 255).

Based on the foregoing, I conclude the ALJ properly considered the relevant evidence and adequately articulated how Mr. Davis's statements were inconsistent with that evidence. Mr. Davis's arguments that the ALJ did not properly evaluate the evidence and failed to articulate a rationale for discrediting his testimony beyond the boilerplate paragraph are unpersuasive.

The record evidence suggests Mr. Davis is in some degree of pain and has some functional limitations resulting from his physical and mental impairments. But the substantial evidence standard of review is a constraining one in which courts must give significant deference to the ALJ's "zone of choice." *Mullen*, 800 F.2d at 545. Given that the ALJ adequately explained his Step Three findings, supported his RFC with an analysis of the record evidence in accordance with the regulations, and considered all relevant evidence in evaluating Mr. Davis's symptoms, I cannot step into the ALJ's shoes and reweigh or reevaluate the evidence. I am thus constrained to recommend the District Court affirm the ALJ's decision.

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I find the

Commissioner's decision denying disability insurance benefits supported by substantial evidence

and recommend the decision be affirmed.

Dated: June 16, 2022

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and
Recommendation, a party may serve and file specific written objections to the
proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R.
Civ. P. 72(b)(2);** *see also* **28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly
asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or
waiver of the right to raise the issue on appeal, either to the district judge or in a
subsequent appeal to the United States Court of Appeals, depending on how or
whether the party responds to the Report and Recommendation.** *Berkshire v.
Dahl,* **928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not
merely indicate a general objection to the entirety of the Report and
Recommendation; "a general objection has the same effect as would a failure to
object."** *Howard v. Sec'y of Health and Hum. Servs.,* **932 F.2d 505, 509 (6th Cir.
1991). Objections should focus on specific concerns and not merely restate the
arguments in briefs submitted to the Magistrate Judge. "A reexamination of the
exact same argument that was presented to the Magistrate Judge without specific
objections 'wastes judicial resources rather than saving them and runs contrary to
the purpose of the Magistrates Act.'"** *Overholt v. Green,* **No. 1:17-CV-00186,
2018 WL 3018175, at \*2 (W.D. Ky. June 15, 2018) (quoting** *Howard,* **932 F.2d at
509). The failure to assert specific objections may in rare cases be excused in the
interest of justice.** *See United States v. Wandahsega,* **924 F.3d 868, 878-79 (6th
Cir. 2019).**